# EXHIBIT F

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
202.747.1900 main
202.747.1901 fax
www.sheppardmullin.com

202.747.1907 direct
skline@sheppardmullin.com

**FOR SETTLEMENT PURPOSES**
**SUBJECT TO FRE 408(A)**

March 15, 2021

File Number:  0100-092358

BY EMAIL AND UNITED PARCEL SERVICE

Michael Feinberg, Esquire
Feinberg, Dumont, & Brennan
177 Milk Street
Boston, MA 02109

Re: Americold Logistics, LLC – Increase in Withdrawal Liability to NETTIPF's Legacy Fund

Dear Mr. Feinberg:

I write on behalf of Americold Logistics, LLC ("Americold") in response to correspondence dated December 21, 2020, from Eileen Savoia and Matthew Casserly, both of whom are employed by the New England Teamsters and Trucking Industry Pension Fund ("NETTIPF" or "Pension Fund").  I believe that you are personally familiar with Americold and its two business units, the Boston Warehouse Unit and the Gloucester Warehouse Unit, both of which have contributed to the Pension Fund and/or the "Alternative Plan" on behalf of their Teamster-represented employees for a number of years.

The correspondence from Ms. Savoia and Mr. Casserly noted that Americold's Boston Warehouse Unit represented by Teamsters Local Union No. 25 had ceased operations as of November 13, 2020, which allegedly triggered both a "withdrawal" from the so-called "Alternative Plan" and the "Snapback" provision of the Withdrawal Agreement.  Americold disagrees with both conclusions, which taken together would raise total withdrawal liability payments to the NETTIPF's "Legacy Fund" by about $1.5 Million (without interest).  Americold requests that the decision be reversed.

In concluding that a complete withdrawal occurred from the "Alternative Plan," the Pension Fund failed to note that the Gloucester Warehouse Unit was still engaged in operations covered by the Fund and subject to a collective bargaining agreement, and that it continued making contributions to the "Alternative Fund."  Indeed, the amount of contributions attributable to Gloucester have increased as customers from Boston relocate business to Gloucester and, as employment in Gloucester grows, there will soon come a point where the contributions from Gloucester alone will exceed those of Gloucester and Boston combined.

The Gloucester facility has hired and filled 8 new positions over the last year and anticipates additional hires as volume grows.  Teamsters Local 25-represented employees were all offered the opportunity to transfer permanently to Gloucester in lieu of furlough, all part of the extensive cooperation between officials of Teamsters Local 25 and Americold when it became clear in the

**SheppardMullin**

March 15, 2021
Page 2

early summer of 2020 that the Boston Warehouse was going to be sold as part of areawide redevelopment.  In addition, throughout the summer and fall, Local 25-represented employees were given the opportunity to work out of the Gloucester facility under the Boston labor agreement, again based on the good will and cooperation of the parties.

As this is a matter of great importance to Americold, a long-term Contributing Employer to the NETTIPF, we expressly request that you provide a copy of this letter to Executive Director Groden and the Trustees of the Pension Fund.

By way of background, in 2017, Americold entered into discussions with representatives of the Pension Fund to completely withdraw from the NETTIPF's "Legacy Fund" and reenter Pension Fund as a "New Employer" in the "Alternative Plan."  Pursuant to ERISA Section 4203, which is referenced in both the Withdrawal Agreement and the Reentry Agreement for Local 25-represented employees, a complete withdrawal from a pension plan only occurs when an employer (and the Agreements define "Employer" as Americold) either (1) permanently ceases to have an obligation to contribute to the pension plan; or (2) permanently ceases all covered operations under the pension plan.  Clearly, under these rules, the closure at Boston did not precipitate a complete withdrawal from "Alternative Plan."  Even with the closure of the Boston Warehouse Unit, all of Americold's covered operations did not cease, nor did Americold  cease to have an obligation to continue making contributions to the "Alternative Fund."

This is conceptually no different from the situation where one but not all subsidiaries ceases covered operations.  In that case, the employer (the controlled group) does not incur a complete withdrawal.  E.g., PBGC Op. Ltr. 92-1, p. 2 (". . . [When subsidiary A is closed . . ., there is no complete or partial withdrawal . . . .  Three members of the controlled group continue to have an obligation to contribute to the plan and continue covered operations. . . .  Thus, for purposes of calculating the amount of liability for a subsequent complete or partial withdrawal . . . A's contribution history remains part of the controlled group's contribution history.").  Indeed, it is more clear cut.

Nothing in the Agreements purports to alter the definition of the statutory terms "withdraw" or "withdrawal" in this context.  At no time during the 2017 discussions did the Pension Plan raise with Americold in writing or orally that the ERISA definition of a complete withdrawal, or the rules on whether an employer had triggered complete withdrawal liability, was inapplicable with respect to either a "complete withdrawal" from the Pension Plan's "Legacy Fund" or a "withdrawal" from the "Alternative Fund."  In fact, the opposite is true.  Indeed, in its own publications, the Pension Fund has provided guidance to contributing employers on the "Process for Current Contributing Employers Transitioning  to New Employer Status," a process that relies upon the Controlled Group remaining **intact** from the time when the then-Current Contributing Employer completely withdraws from the Legacy Plan to the time of its simultaneous reentry into the Pension Plan's second withdrawal liability pool.

Finally, we could locate nothing to suggest that the PBGC approved the Pension Fund's using a definition of "withdrawal" that covers less than all of an employer's covered operations..   The absence of such a PBGC determination is not surprising,  If a statutory, controlled group analysis no longer applied, then if one or two subsidiaries that had signed withdrawal and reentry

**SheppardMullin**

March 15, 2021
Page 3

agreements with the Pension Fund went into liquidation, there could be a withdrawal but no recourse against the controlled group for the assessed withdrawal liability.

Please be advised that, because of the novelty of the arguments presented, Americold has retained as a consultant Mr. Israel Goldowitz of the Wagner Law Group and a former senior executive of the PBGC until his retirement over a year ago.

For the foregoing reasons, Americold requests that the Trustees reverse the decision that the closure of the Boston Warehouse Unit constituted a withdrawal from the "Alternative Fund," thereby triggering an increase in its total withdrawal liability to the Pension Fund's "Legacy Fund" of about $1.5 Million and the full amount payable over 20 years versus 30 years.  As a sign of its good faith, while the Trustees are considering this request, the Boston Warehouse Unit will pay the increased monthly payment of $17,786 to the Pension Fund's "Legacy Fund." If the Trustees agree to Americold's request, and we expressly request that the Trustees will give it early consideration, Americold would expect that the amount of the overpayments would be credited against the pre-snapback amount of withdrawal liability assessed in 2017 and payable over the 30-year period established in 2017.

As a final note, on behalf of Jim Snyder, Executive Vice President and Chief Legal Officer of Americold, we request a meeting with Executive Director Groden and yourself, to discuss these issues further and possible solutions. If more convenient, we would be pleased to meet in Burlington, MA.  Please let me know your availability and that of the Executive Director.

Very truly yours,

Sheldon M. Kline
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP